All right, we'll continue now with Appeal 25-1776, Lewis v. Indiana Department of Transportation. Mr. Macy, you may proceed. Thank you, Your Honor. Good morning, and may it please the Court. My name is Jeff Macy, and I represent the appellant, Keisha Lewis, in this matter. In response to the State's motion for summary judgment—I'm going to just call the Indiana Department of Transportation the State—a motion for summary judgment before the District Court, we presented sufficient evidence that Ms. Lewis' termination was discriminatory and or retaliatory, and we focused much of our briefing on whether the stated reason for her termination was pretextual. Since the case was adjudicated at the District Court, a new potential issue has arisen. Whether our ability to prove pretextual discrimination—I'm sorry, discrimination and retaliation depends on the causation standard under the Rehabilitation Act. So as a threshold matter, I would say we were setting out to argue a case about pretext, and I think it's best to start with causation. The key case that the State pointed to in their response brief was decided while we were filing our opening brief in this case, and that's the Roy M. case. And in that case, relying on the language of the Rehabilitation Act itself and also this Court's prior decisions in Swain and Connors v. Wilkie, this Court indicated that for a plaintiff alleging disability discrimination under the Rehabilitation Act, the plaintiff must show that the adverse employment action at issue, the sole cause of that was the disability. And if you go back and look at Swain, Swain seems to indicate that employment discrimination cases were carved out somehow from a broader standard under the Rehabilitation Act. But as we tried to set out in our brief, the opposite is true. The Rehabilitation Act was enacted more than 50 years ago, didn't have any specific reference to state actors, didn't have any specific reference to employment discrimination. And then as federal law has changed since the Rehabilitation Act was originally enacted, additions were made to the Act to establish the types of liability and the scope of the Act. And the important addition to that was the language added, I think it's Section 5 of the Act, which specifically points courts to Title I of the Americans with Disabilities Act for the standards under which the Rehabilitation Act should be applied. Because of that, and the state argued the same in front of the District Court, we have relied on the but-for causation standard in this case, and all employment discrimination cases under the Rehabilitation Act. Sole cause predates the Americans with Disabilities Act, and I couldn't find another statute under the federal law that requires sole cause as the threshold showing for a violation of the Act. Why does this matter? And courts that the state relied on in their brief have contrasted sole cause with motivating factor repeatedly. And motivating factor, other courts have applied to as the standard for disability discrimination. In this circuit, I believe motivating factor is only applied in Title VII. In the Kurtzholz case we cited, it's clear that this court has applied over and over but-for causation as the causation standard under the Americans with Disabilities Act. If you look at some of the cases, including the Fifth Circuit case relied on by the defendant, you'll see, and there's a Sixth Circuit case, you'll see that the court is resisting plaintiff's attempts to broaden the standard for causation to motivating factor, which courts have interpreted as somehow less than but-for causation. But only in this case in Swain, in this circuit in Swain and then in Rand, has the court seemed to indicate that there's a third standard of causation that is even stricter than but-for, which is sole cause. And respectively, as a epistemological matter, if that's the correct word, I think it would be impossible to provide that anything was the sole cause for any given adverse employment action. Sorry, Judge Rivera. But if we should, if we should determine that the sole cause standard is the appropriate one, can your claim survive under that very stringent standard? Under the dictionary definition of sole cause, I don't believe any plaintiff could ever survive that standard. If you read sole cause as interchangeably, which with but-for cause, then yes, then yes. I think a lot of the confusion in this area started after the gross versus financial services case, which interposed in the America's Age Discrimination Employment Act, this but-for causation standard. Courts were often reading that as meaning that there needed to be one cause and one cause only. As the Supreme Court pointed out in the Bostock case, but-for cause does not mean sole cause. But I think there's a lot of confusion in the case law about the differentiation between the two. And I would suggest that the way to harmonize these cases is to simply read the decisions. And if you look at Swain and you look at Royanne, you'll see that sole cause was really being read as but-for causation. I think given the way that the causation has sort of developed from gross, which I guess was 15, 16 years ago, through Bostock to date, I think the court should read the Rehabilitation Act Americans with Disabilities Act standard, and that is but-for causation. And under that standard, I do think we prevail. There's two sort of other hiccups in the law that seem to indicate that sole cause and but-for should be read interchangeably. One is, as we pointed out in our brief, there are cases from the circuit applying Title 2 or Title 3 of the ADA and the Rehabilitation Act in the same case, and they're being read interchangeably. In the AAH versus Illinois case, this court dealt with the standards as but-for causation under ADA Title 2 and Title 3 and the Rehabilitation Act. It would be kind of an absurd result that Title 2 and Title 3, which aren't specifically referred to in the Rehabilitation Act, have a broader standard than Title 1 claims under the ADA, which have specifically, the Rehabilitation Act specifically points to the ADA. The idea that that means there's a stricter standard for Title 1 claims than Title 2 or 3 claims doesn't make sense in consistency with the statute. The third sort of area of inconsistency are in the retaliation cases under the Rehabilitation Act. Rehabilitation Act does not, in its own language, provide for a cause of action for retaliation. This court has looked at the ADA and applied the ADA language, which prohibits retaliation in connection with the individual claims under the Rehabilitation Act. The way that it's set up, if sole cause applies only to Title 1 claims under the ADA for disability discrimination, would mean that the retaliation claims have a different standard because they're being brought under the ADA, which is incorporated, that is somehow not constricted by the solely by reason of language in the Rehabilitation Act. Mr. Macy, can I take you to the question in pretext? Yes. I understand your position to be that Mr. Geibel supposedly contradicted himself as to what triggered the decision to terminate your client. You've got these two passages. One was, in essence, he wanted a report and she told him to prepare it himself. And the other was the discovery of these hundreds of parcels that she was way behind in her work. When I look at those passages, I guess I have some trouble seeing a direct contradiction there, such that it would be possible to infer that either one was pretextual. Help me see what you're seeing. Yes. In Mr. Geibel's testimony, I would say that her telling him to prepare herself is kind of reading it in favor of the state. Her testimony, and I think Mr. Geibel acknowledges that she asked for help. She didn't know how to prepare the report. She asked for Mr. Hutcherson, who had previously prepared the report to help her. She reached out to Mr. Hutcherson and she was instructed not to. And then in his testimony, at his deposition, Mr. Geibel testified that it was impossible for her to prepare this report without Mr. Hutcherson. Our position was, if they sincerely wanted this report and this was the basis for her termination, they would have not prevented her from consulting with a person in the Department or in the Department of Transportation who had prepared the report. Similarly, Julie Foreman testified on page 65 of her deposition, page 80, which is docket 50-3, that the report issue was the basis of Ms. Lewis's termination. It was only... No, you... Oh, go ahead. I'm sorry. No, no. You finish your thoughts. It was only in the record, in the deposition testimony, that he had, Mr. Geibel had testified that later they discovered that there were these parcels that were not cleared. We dispute the fact that these parcels were not cleared. There are two types of parcels at issue in this case. One are the work of moving people, in fact, out of their houses or their properties to make way for Interstate 69 in Indiana. The second was the hundreds of open files that were sent home with Ms. Lewis at the onset of the COVID-19 outbreak. Those hundreds of parcels, they were having her close out physically and bring back. My understanding was that Mr. Geibel, when she left, realized that she had parcels at  But these were not her entire duties were closing out those parcels, and they weren't related to customer service. They were related to the record keeping of the Indiana Department of Transportation. I would also point to the termination language in the termination notice, which is docket 50-23, which doesn't refer at all to failing to close out parcels. It says she was guilty of unprofessional conduct and poor judgment and reportedly failing to follow direct orders. That doesn't refer at all to any kind of cost associated, any kind of jeopardy. They're referring to her disputes with them about her ability to prepare the report. The evidence showed that she could not perform this report herself, and it was admitted by the state, both Geibel, and Geibel explicitly admitted that it would have required Hutchinson's help. And Foreman also testified that it was the failure to prepare the report that led to her termination. That issue is squarely contradicted both by Geibel's testimony and also Ms. Lewis' testimony. Because of that, under the Reeves case and the Caterpillar case we cited, evidence that the employer's reason was made up, in this case Mr. Geibel admitted that she could not do it. That's evidence sufficient to reach a fact finder, especially when you look at the entire history of her performance with the department, her reviews, all of the objective evidence that occurred prior to her exercise of the accommodation. I'm going to reserve the rest of my time. Thank you. Very good. Thank you. We'll now move Mr. Comer to you for argument on behalf of the appellee. Thank you, Your Honor. May it please the court. Evan Comer, representing the Indiana Department of Transportation. Lewis was not terminated either because of her disability or her race. While we've talked a lot today about the proper test for causation, the department prevails under either of them. If we're under sole cause, then Lewis' claims fail because she was terminated for insubordination and poor performance. If we're under but for causation, then she hasn't shown a genuine dispute about pretext. Indeed, Lewis was obligated to rebut each of the reasons cited by the department as grounds for her termination. But she provided no evidence contesting, first, the fact that she refused to do work assigned to her. Second, the negative comments she made about Director Geibel's ability to lead the division. Third, the fact that she spoke over... Weren't those comments at the very outset of when he joined them? That is correct, Your Honor. And how long a delay was there? So, that would have been around 2020. And then there was a two-year delay until 2022. So, certainly, it wasn't an immediate... It wasn't the immediate cause. If we were talking about a retaliation case, we'd say that would be, obviously, way too long a time, in most cases, to permit a causation inference, right? Certainly, Your Honor. And so, we agree that that was not the immediate cause, but it is something that's percolating in the background. But you're saying she loses because she didn't refute that two-year-old accusation? I apologize, Your Honor. Not because she didn't refute that two-year-old accusation, but it is one of the things that is undisputed in this case. Definitely, the timing of the termination raised questions in that they expressed an intent to wait until her complaint was resolved so as to avoid the appearance of retaliation and then terminated her shortly after it was denied. Certainly, we acknowledge, Your Honor, that there are times where timing, in combination with other factors, may give rise to evidence of pretext or evidence of retaliation. But you always need more than just timing. And here, we don't have that in the record. And I think what those comments reflect is an intent to avoid the appearance that there will be—that adverse action or discipline will be retaliatory. And so, what the instruction from HR is that let's wait. Essentially, let's let the independent investigation play out. Yeah, I understand that position. I won't focus on the wisdom of that advice right now. But it does seem to have produced the effect that there's no progressive discipline that might have been imposed while that complaint was still pending. And then as soon as the complaint is resolved, now we're going to fire her. That seems kind of abnormal for Indiana personnel policies. Well, a couple of points there, Your Honor. First of all, progressive discipline is not legally required. It's not legally required, no. But where an employer has standard policies and practices, departures from that can be relevant evidence. Absolutely, Your Honor. And something else that I think that is relevant here as well, there isn't a formal work improvement plan put in place. There are escalations that happen throughout the course of this time period. And each one of those escalations, and this is important, is justified by an undisputed non-discriminatory reason. And so, we start from the beginning with the envelope stuffing. She's instructed that she has to go back to the envelope stuffing because that was a job duty that was transferring over to her anyway. And she didn't have the authority to tell the finance team that she wasn't going to do it. And then if we go to the daily meetings, well, those come about after the issues with Lewis unilaterally rejecting the work for the finance team and after the issue with the Facebook post kind of blew up. And then we have the weekly report, and that is documented in the record as well. We have even the earliest emails from Foreman where she's acknowledging that there's some sort of parcel backlog. And then in the October 27th email that she sends to the HR team, she notes that Lewis is turning in a lot of hours for what doesn't appear to be a lot of work. And so there are, and Lewis admits this in her own deposition testimony, there are concerns about, you know, what is she doing while she has this work from home accommodation? And what discipline was imposed short of termination? Well, so, none. So we acknowledge that they went to termination. That's my concern, yeah. But... So the plaintiff relied on the Murphy against Caterpillar opinion from last year, where there are some substantial similarities in the facts to this case. You did not discuss it at all in your brief. I'm wondering if you have any thoughts you'd like to share on it. Your Honor, I am, I apologize. I'm not, the facts of Murphy are escaping me at the moment. But our position is that this case is closer to Monroe versus Indiana Department of Transportation. Monroe involves an employee who had a disability. In that case, it was PTSD, who was making derogatory and berating comments to his employees. He had a longer history of positive job performance appraisals than Lewis does. And he also had evidence, there's undisputed evidence in the record of his employers meeting and discussing whether he was in fact disabled. And the court there found that none of that created evidence of pretext. And I think here, critically, the reason why Monroe is helpful is the backlog of past positive performance appraisals only gets us so far. Because what matters, and what this court has consistently said, what matters is the employee's performance at the time. And what we know from Geibel, and Geibel's testimony is that he is the person who ultimately made the call to terminate her. The discovery of the 400 parcel backlog was kind of a lightning rod. It was the moment that he realized that not only was Lewis underperforming, but her underperformance had put the department in jeopardy of losing its federal funding. Although it's true that, you know, she acknowledged in an email that she was two years behind closing out parcels, in that email, she also attributed it to her being the only person in the department during that time. So what evidence would there be in the record supporting an inference that the backlog was the result of poor work performance, as opposed to understaffing? Well, so a couple of things there, Your Honor. First of all, we don't dispute that Lewis had a difficult job, that she had a lot on her plate. But this court doesn't sit in the position of a super personnel department, and we're not going to, you know, second guess whether the department here was making wise decisions about the distribution of work, or whether there were understaffing problems. What we care about is whether Lewis was being discriminated against because of her disability or because of her race. And here, even if that's true, that doesn't link back to her disability or to her race. And that's ultimately why Lewis's claim fails. Because the cause is, even if the department had bad cause for terminating her, which we don't concede, we believe that a 400 parcel backlog that puts you at risk of losing federal funding is a very good cause for termination. But that's neither here nor there. Even if the department had a bad reason, so long as it wasn't a discriminatory reason, then Lewis's claims can't prevail. And here, Lewis hasn't shown anything tying the understaffing back to her disability or to her accommodation. And in fact, I think the evidence is that the understaffing predates the accommodation. And also, Lewis's performance precipitously declined after this work from home accommodation went into place. And the undisputed evidence is that at her last full performance appraisal, she closed out 1,000 out of 1,075 parcels. So she had a 75 parcel backlog. And then less than a year later, at the end of 2022, we were at a 400 parcel backlog. And so that just kind of reinforces what I think Foreman had come to suspect all along, that while Lewis was on this work from home accommodation, she wasn't doing what she had been doing in the past. And that, in turn, put the entire department at risk of losing federal funding. The department had to take significant and rapid remedial steps to correct it, which resulted in them incurring a cost of $150,000. And I don't see any evidence. I don't see any case that says that when you have somebody who has to spend $150,000 remediating a problem, that we can get to an evidence that that was a lie, that the justification proffered was untrue. Mr. Comer, can I ask you a couple of questions about briefing? One is just an observation. In page 17 of your brief on just the standard for summary judgment, I was actually a little startled and did a double-take because it's exactly backwards. You wrote, like the district court, this court looks, quote, at the facts in the light most favorable, close quote, to Lewis, who was the non-moving party, so far so good, and determines whether she, quote, is entitled to judgment as a matter of law. I apologize, Your Honor. I recognize that that's a mistake. I don't know if that's repeated elsewhere. All of us are so used to reading the standards for summary judgment. Certainly, Your Honor. Thank you for flagging that. No, I acknowledge that's an error. More substantively, could you direct us in the district court summary judgment briefing to where you were raising the backlog issue, this 400 parcel issue, as the reason to justify this termination decision? So certainly, Your Honor, we do acknowledge that the backlog was not cited as a justification in our opening brief. We also acknowledge that the 400 parcel number wasn't cited in the reply brief either. But what is cited is Lewis's statements about the backlog, and that comes on page 2 of the reply brief. And of course, I know that opposing counsel has made arguments about that. But the district court, importantly, did consider the evidence of the backlog. Right. The district court considered it. The question, though, is really, what I'm hearing in the plaintiff's brief is, in essence, they got ambushed because you guys really didn't rely on that. And the district judge dug into the record herself, which she's perfectly entitled to do. But as a result, plaintiff contends, and he can rephrase this more precisely than I can, but in essence, they didn't get a fair chance to respond to that, and that the facts are a lot more complicated than the district judge appreciated. Certainly, Your Honor. We understand that to be their argument as well. But I think a couple of points there, and as I think Your Honor has alluded to, there's nothing wrong with Judge Magnus Stinson considering unsighted evidence in her summary judgment order. The evidence is clear in the record. Geibel's testimony, Lewis was aware of it from the moment it came out. The problem we get into, Judge Posner put it in an opinion quite crisply, in essence, that if the defendant moves for summary judgment on Ground A, then it can't be granted on Grounds B and C, which might have been raised, but were not. And I recognize Your Honor's frustration with that situation, and I recognize Judge Posner's, what Judge Posner is getting at. I would note, I don't believe that there was any type of post-judgment motion filed with respect to that, which obviously they're not obligated to, but it's not there in the record. And so we're in an awkward position on appeal where we have this judgment. We can't ignore this critical piece of evidence that the district court judge relied on it. But because it's in there, I think that we do have to respond to it, and we do have to defend it. And even if . . . Oh, I agree with you. And even if that is not . . . even if we set that aside, though, we still have the issue of insubordination, which on its own is sufficient to justify Lewis's termination for nondiscriminatory reasons. And there's no pretext with respect to the insubordination either. What do we do with the Geibel testimony that your colleague described, indicating that he knew to get this report together, she was going to need to get Hutchison's help? Well, I believe that what Geibel said is that if the report had required Hutchison's help, then he would have expected her to get it. But what Geibel and Foreman were saying in the email chain is that they didn't need Hutchison's help. They just wanted a list of what tasks she was working on at a given time, which was something that did not require Hutchison's help. If there are no further questions, Your Honor, the department respectfully asks that this court confirm the judgment of the district court below. Thank you, Mr. Comer. Mr. Macy, we'll go back to you now for a rebuttal argument. Thank you, Your Honor. Just with respect to the record, obviously, as Judge Hamilton pointed out, the district judge was perfectly entitled to look through all the evidence, and the defendant put in all the depositions in the case. But under the standard, under Rule 56, they're supposed to provide the evidence in the form of declarations that justifies their position, then we can respond to it. And I'd point back to the termination notice again, which is DACA 50-23, and that occurred prior to any litigation. And in that termination notice, there's nothing that refers to either the number of parcels or a charge or a fear of loss of federal funding. And respectfully, if you live in Indiana, the idea that with respect to this project, which took 15, 20 years, that Ms. Lewis, having files at her house that she hadn't closed out and physically brought back to the office, jeopardized the federal funding of that project, I think that'd be a difficult argument to make to a jury in Marion County. All of this is to say is that the plaintiff never got a reason, a specific reason, about her termination. It was all developed through emails between Foreman and Geibel, complaints made by Foreman and Geibel to Human Resources, and then even after the fact, relied on by the district court, so that it was slippery. And the plaintiff tried to pin down the exact reason as best she could. She deposed both decision makers. Both of them identified the report Geibel testified Hutchinson needed to help provide it. To shift it to a reason after that is also evidence that there was pretext of what. Thank you, Mr. Macy. Thank you, Mr. Comer. The case will be taken under revisement.